# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SPECIAL SITUATIONS FUND III QP, L.P.,
SPECIAL SITUATIONS CAYMAN FUND,
L.P., SPECIAL SITUATIONS PRIVATE
EQUITY FUND, L.P., and DAVID M.
GREENHOUSE,

       Plaintiffs,

       v.

STEVEN F. SANTO, BARRY GORDON, A.
CLINTON ALLEN, STEPHANIE CUSKLEY,
RICHARD B. DEWOLFE, ARTHUR H.
GOLDBERG, ROBERT LEPOFSKY, and
RICHARD A. PYTAK, JR.,

       Defendants.

No. _____

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

Page

I.    NATURE OF THE ACTION ...................................................................... 1

A.   AVANTAIR'S SYSTEMIC INDIFFERENCE TO PROPER
MAINTENANCE AND SAFETY LED TO ITS DOWNFALL ........................... 2

B.   DEFENDANTS' SYSTEMIC INDIFFERENCE TO SAFETY CAN BE
TRACED AS FAR BACK AS 2006, SHORTLY AFTER ITS FOUNDING ........ 5

C.   AVANTAIR DELIBERATELY HID ITS HISTORY OF SYSTEMIC
MAINTENANCE PROBLEMS FROM PLAINTIFFS AND THE PUBLIC ......... 6

II.   JURISDICTION AND VENUE ................................................................ 8

III.  PARTIES ................................................................................................ 9

A.   PLAINTIFFS ................................................................................... 9

B.   DEFENDANTS ............................................................................... 10

IV.   CONTROL ALLEGATIONS/GROUP PLEADING ................................ 11

V.    FACTUAL ALLEGATIONS ................................................................. 13

A.   AVANTAIR ................................................................................... 13

1.   Fractional Aircraft Ownership ................................................ 13

2.   The Piaggio P-180 Avanti Aircraft ......................................... 15

B.   AVANTAIR'S HISTORY OF SYSTEMIC MAINTENANCE PROBLEMS ..... 16

1.   Pre-2009 FAA Fines ................................................................ 16

2.   The 2009 FAA Investigation ................................................... 17

i.    The September 15, 2009 FAA Cure Notice ................... 17

ii.   The Risks Facing Avantair's Business .......................... 19

iii.  The October 20, 2009 FAA Cure Notice ....................... 20

C.   AVANTAIR DELIBERATELY FAILED TO DISCLOSE TO ITS
INVESTORS THE ONGOING FAA INVESTIGATION OR THE
COMPANY'S SYSTEMIC MAINTENANCE PROBLEMS ........................... 22

1.   The October 16, 2009 SPEA ................................................... 22

            2.      The Form 10-K ............................................................................25

      D.    THE RISKS FACING AVANTAIR AS A RESULT OF ITS SYSTEMIC
            MAINTENANCE PROBLEMS ULTIMATELY MATERIALIZED, AS
            THE FAA PERMANENTLY GROUNDED THE COMPANY'S FLEET,
            WHICH FORCED AVANTAIR INTO BANKRUPTCY ...................................28

            1.      The FAA Issued Twenty-Two EIRs Regarding Avantair's
                    Maintenance Violations and Avantair Temporarily Grounded its
                    Fleet ................................................................................................28

            2.      Avantair Settles the FAA Charges for $500,000 but Its Culture of
                    Disregard for Safety Regulations Persists .................................32

            3.      The CW Confirms That Avantair Continued to Flout FAA
                    Regulations Before its Demise .................................................35

            4.      Avantair Is Involuntarily Forced into Bankruptcy by its Creditors...........36

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS CAUSE
      PLAINTIFFS SUBSTANTIAL LOSS...................................................................38

COUNT I     Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated
            Thereunder – Misstatements and Omissions (Against All Defendants)................39

COUNT II    Violations of Section 20(a) of the Exchange Act
            (Against All Defendants)........................................................................41

COUNT III   Violations of Blue Sky Law
            (Against All Defendants)........................................................................42

Plaintiffs Special Situations Fund III QP, L.P., Special Situations Cayman Fund, L.P., Special Situations Private Equity Fund, L.P., and David M. Greenhouse (collectively, the "Special Situations Funds" or "Plaintiffs"), by their undersigned attorneys, by way of Complaint and Jury Demand, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief are based on, *inter alia*, its investigation made by and through its attorneys, which investigation includes, among other things: (1) a review of public documents; (2) a review and analysis of filings made with the Securities and Exchange Commission ("SEC") made by Avantair, Inc. ("Avantair" or the "Company"); (3) pleadings and other documents relating to various civil and administrative investigations and proceedings involving Avantair, including Federal Aviation Administration ("FAA") investigation documents obtained pursuant to Freedom of Information Act ("FOIA") requests made in 2014; (4) news releases and media reports of Avantair; and (5) interviews with former Avantair employees and other individuals with relevant personal knowledge.

Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    By a contract dated October 16, 2009 and consummated on October 20, 2009, the Special Situations Funds purchased more than 6.4 million unregistered shares of Avantair common stock pursuant to a Securities Purchase and Exchange Agreement ("SPEA"). These shares were purchased in connection with a private placement by Avantair in which the Company raised $8.4

million in capital.  Before being forced into bankruptcy in July 2013, Avantair was a publicly-traded aviation service provider that derived its revenue from selling fractional shares of ownership in Piaggio P-180 Avanti ("Avanti") twin-engined turboprop aircraft.[1]

2.      Unbeknownst to Plaintiffs, at exactly the same time they were making their investment in the Company, the FAA was investigating Avantair for its deliberate violations of federal maintenance and safety regulations.  In July 2009, FAA investigators conducted one week of inspections on Avantair aircraft.  These inspections uncovered numerous regulatory violations, which the FAA disclosed to the Company in cure notices sent on September 15, 2009 and October 20, 2009.  Neither the FAA investigation nor the cure notices were ever disclosed to Plaintiffs.

3.      Plaintiffs bring this action under the federal securities laws against Avantair's officers and directors.  Defendants' misconduct arises out of their false and misleading statements concerning Avantair's flight operations, aircraft maintenance, and safety and technical procedures. With shameless disregard for internal controls and management supervision, Defendants engendered a culture of sheer indifference to maintenance and safety issues, which permeated the entire organization from the top down.  In the end, the risks of such a reckless corporate culture materialized, and the Defendants' disregard for good maintenance and safety directly caused the Company's downfall.  As a result of Defendants' securities law violations, Plaintiffs collectively have lost in excess of $6 million.

## A.      AVANTAIR'S      SYSTEMIC      INDIFFERENCE      TO      PROPER MAINTENANCE AND SAFETY LED TO ITS DOWNFALL

4.      Avantair sells fractional ownership interests and chartered usage of private aircraft.

---

[1] As will be explained in greater detail below, the Avanti is a small rear-engined turboprop airplane that is manufactured in Italy, and was flown commercially in the United States only by Avantair.  The Avanti was the only aircraft operated by Avantair.

5.      Despite operating a business in which the reliability of its services was literally a life and death matter, Avantair's directors and officers ran its aircraft operations with reckless disregard for significant maintenance and safety issues. In a May 2014 post-mortem analyzing the reasons for Avantair's failure, *Business and Commercial Aviation*, a leading aviation industry publication, quoted one of Avantair's customers **thanking God that "no one was killed on these badly maintained planes."** That same article recounted a story from an Avantair maintenance manager:

> **there was a lot of pressure from management to convince my mechanics to do things that were not legal** . . . . I didn't like how they intimidated my people, forcing them to sign off illegal work from minor stuff to really major infractions. **I started to stress to my people that it starts small and then goes big, and pretty soon you're sitting and talking to the [Federal Aviation Administration], which inevitably did happen to one of my guys.** They [the managers] were doing anything they could to keep the airplanes in the air.

6.      According to that maintenance manager, Avantair was "over-flying a lot of time-sensitive items." In addition, Avantair cannibalized parts -- a term of art meaning that Avantair improperly took parts from one aircraft to repair another, broken-down aircraft. As the maintenance manager recounted in the May 2014 *Business and Commercial Aviation* article, "there were times when an airplane would come in, and as a normal procedure the mechanics would do a pre-run of the engines and systems for diagnostic purposes, and management would order us to start removing parts from the airplane while the engines were still running."

7.      A former employee interviewed by Plaintiffs' counsel, and referred to throughout the Complaint as the Confidential Witness ("CW"), has revealed Avantair's institutional indifference to FAA-mandated safety regulations. According to the CW, a thirty-year aviation industry veteran hired by Avantair in May 2013 to "save the air carrier," Avantair operated in a culture "in which procedures were contrary to the [Federal Aviation Regulations] and everything

-3-

that [the CW] was taught." When the CW investigated the cause of the problem, the CW discovered that "senior management" would pressure those who did not cut corners "with the threat of job loss." The CW personally observed "senior management" systematically put undertrained or unqualified personnel in charge of tracking parts or complying with FAA regulations.

8.     Avantair twice had to ground its fleet under pressure from the Federal Aviation Administration ("FAA"). The first grounding occurred in October 2012, and lasted a month. According to a November 13, 2012 e-mail from Defendant Steven F. Santo ("Santo"), Avantair's founder and Chief Executive Officer, the grounding was precipitated by, among other things, the fact that a piece of the tail of one of Avantair's aircraft had fallen off mid-flight, *yet the plane landed and took off again twice before anyone noticed.* Defendant Santo downplayed the incident, citing the Piaggio's "unique design" as the reason its pilots never noticed *that the piece of the tail used to make the plane climb or descend was missing.*

9.     Some Avantair aircraft remained permanently grounded after October 2012 and have never flown since. Others, however, returned to operation, only be grounded for a second and final time in June 2013, when Avantair ceased operations altogether. According to a report filed with the Securities and Exchange Commission on Form 8-K on June, 12, 2013 and signed by Santo, this second grounding stemmed from the Company's uncertainty over the manner in which the Company monitored parts that had time-limited life spans. In other words, Avantair did not accurately record which of its parts were too old to operate safely. But according to a December 2013 article in *Business and Commercial Aviation*, the problems were worse than that.

> Subsequent FAA inspections of Avantair aircraft . . . revealed the "unairworthiness of a sizeable sample" of the Avantair fleet, including missing engines and propellers and dozens of other

discrepancies in documentation, missing components, loose panels and other issues.

10.     These problems were nothing new to Avantair.  Indeed, they were systemic and well documented, and resulted from a decade-long institutional culture of disregard for proper safety procedures and federal aviation regulations.  Upon information and belief, even the October 2012 grounding failed to cure the problems with Avantair's aircraft and failed to deter the Defendants from continuing to flagrantly disregard all requisite maintenance and safety practices.

## B.     DEFENDANTS' SYSTEMIC INDIFFERENCE TO SAFETY CAN BE TRACED AS FAR BACK AS 2006, SHORTLY AFTER ITS FOUNDING

11.     In March 2006, the FAA fined Avantair $30,000 for trying to conceal an overheating warning indicator light with a piece of black tape.  The warning indicator had been illuminated for eight flights.  According to files obtained by *Aviation International News*, another aviation industry publication, in June 2008 the FAA again punished Avantair, this time with a $500,000 civil penalty, for separate maintenance-related issues.

12.     Subsequent to the June 2008 fine, the FAA launched an investigation into Avantair focused on the safety and operation of its aircraft.  This investigation lead to the FAA documenting the first of what would be twenty-two separate instances of noncompliance, all of which were eventually settled with the FAA for a $500,000 civil penalty in November 2012. Each incident of noncompliance was memorialized in an FAA Enforcement Investigative Report ("EIR").  The first of these twenty-two EIRs was disclosed to Avantair -- but not to the public or Plaintiffs -- in a September 15, 2009 cure notice written to the Company's Managing Director at the Company's Clearwater, Florida headquarters, wherein the FAA cited Avantair for twenty-six separate maintenance violations of federal aviation regulations, *all stemming from a single aircraft.* Among other issues highlighted, this aircraft, bearing the registration number N102SL, was

-5-

returned to active service with parts missing and was flown with engines that were inspected improperly.

13.     This conduct was particularly egregious.  Upon information and belief, because of the fact that Avantair only flew one type of rare aircraft, documented problems with one plane were indicative of problems with Avantair's entire fleet.

14.     Another letter to the Managing Director, dated October 20, 2009 and referencing the same EIR, cited ten more regulatory violations, including five related to the N102SL aircraft referenced the September 15, 2009 EIR letter.  The violations cited in both this letter and the September 15, 2009 letter were precipitated by inspections conducted by the FAA starting on July 27, 2009.

## C.     AVANTAIR DELIBERATELY HID ITS HISTORY OF SYSTEMIC MAINTENANCE PROBLEMS FROM PLAINTIFFS AND THE PUBLIC

15.     Despite the obvious pendency of an FAA investigation, and the Company's history of pervasive institutionalized maintenance problems -- which would eventually lead to its downfall -- Avantair went forward with a private placement to raise capital in the fall of 2009.  As a part of that private placement, Plaintiffs purchased more than $6 million of unregistered Avantair securities.  But the October 16, 2009 SPEA which governed the parties' rights under the private placement did not disclose to Plaintiffs the FAA proceedings in progress at that time, Avantair's prior FAA fines, the real threat of future fines, or the September and October 2009 EIR letters.

16.     To the contrary, Avantair specifically represented and warranted in the SPEA (i) that nothing about the Company had adversely and materially changed since June 30, 2009, (ii) that the Company had not received any notice of proceedings that "could reasonably be expected to have a material adverse effect" on the Company, and (iii) there were no pending suits or

proceedings against or affecting the Company and that no such suits or proceedings were threatened or contemplated.

17.   These representations and warranties were materially false and misleading, and were contradicted by the very existence of the EIR letters. Specifically, the July 27, 2009 FAA inspection led to FAA proceedings that Avantair was made aware of *one month prior to the October 16, 2009 SPEA and private placement.*

18.   In light of Avantair's systemic failure to properly maintain its aircraft and comply with applicable FAA regulations -- which was especially critical given the very nature of the heavily regulated business in which the Company was engaged -- it was incumbent upon Avantair to disclose to its investors that at the time they were making their investment in the Company the FAA was engaged in an investigation *which could (and indeed did) ground their entire fleet*. At the very least, disclosure of the pending FAA investigation would have led Plaintiffs to undertake additional, more focused due diligence with regard to the specific problems identified by the FAA's pending investigation in particular, and the overall safety and maintenance practices of Avantair in general.

19.   Likewise, Avantair's Form 10-K for the fiscal year ending June 30, 2009, which was filed on September 28, 2009 and incorporated by reference in the October 16, 2009 SPEA, failed to disclose anything about the FAA investigation or the EIR noticed to the Company in the FAA's September 15, 2009 letter. Specifically, Avantair stated that the Company was subject to extensive regulation by the FAA, noting that the FAA "may" issue orders relating to the inspection of aircraft and "from time to time" issue "directives and other regulations" relating to aircraft maintenance and operation. Avantair further stated that its business operated pursuant to an FAA Air Carrier Operating Certificate that "is potentially subject to amendment, suspension or

revocation in accordance with procedures set forth in federal aviation laws." The Form 10-K did not, however, disclose that the FAA had in fact recently issued an EIR highlighting the numerous ways in which the Company's aircraft were presently violating those same federal aviation laws.

20.     In other words, at the time Plaintiffs made their investment, Avantair's public filings disclosed material and known risks facing the Company, including the ever-present risk of FAA action that could ground Avantair's fleet and jeopardize its business. In response to these known risks, and to induce Plaintiffs' investment, Avantair agreed to provide certain crucial representations and warranties in the SPEA. The representations and warranties in the SPEA were designed to address the Company's known and foreseeable risks and reassured Plaintiffs that those risks had not materialized and were not likely to do so in the future based on currently available information.

21.     As alleged herein, those representations and warranties were false when made.

22.     Plaintiffs thereafter purchased more than $6 million dollars of Avantair common stock in reliance on the representations -- and omissions -- made in the SPEA and the statements made in Avantair's 10-K. By the time that Avantair's institutional disregard for federally mandated aviation maintenance standards had materialized and drove Avantair into bankruptcy, Plaintiffs investment became worthless.

## II.     JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

24.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

25.     Venue is proper in this District pursuant to Section 22 of the Securities Act of 1933 (the "Securities Act"), Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Avantair is a Delaware corporation, with its principal place of business located in Clearwater, Florida.  Avantair maintains its executive offices in this District and many of the false and misleading statements were made in or issued from this District.  Avantair was subject to an involuntary petition for bankruptcy by its creditors on July 25, 2013, which bankruptcy proceeding is currently pending in the Bankruptcy Court for the Middle District of Florida

26.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## III.   PARTIES

### A.   PLAINTIFFS

27.     Plaintiff Special Situations Fund III QP, L.P. is a limited partnership organized under the laws of Delaware.  It acquired 3,947,369 unregistered shares of Avantair under the SPEA for a purchase price of $3,750,000.55.

28.     Plaintiff Special Situations Funds Cayman Fund, L.P. is a limited partnership organized under the laws of Delaware.  It acquired 1,315,790 unregistered shares of Avantair under the SPEA for a purchase price of $1,250,000.50.

29.     Plaintiff Special Situations Private Equity Fund, L.P. is a limited partnership organized under the laws of Delaware.  It acquired 1,052,632 unregistered shares of Avantair under the SPEA for a purchase price of $1,000,000.40.

30.     Plaintiff David M. Greenhouse ("Greenhouse") is a New York citizen and the General Partner of Plaintiffs Special Situations Fund III QP, L.P., Special Situations Cayman Fund, L.P., and Special Situations Private Equity Fund, L.P.  Greenhouse acquired 425,000 shares of Avantair under the SPEA for a purchase price of $403,750.

**B.     DEFENDANTS**

31.     Defendant Steven F. Santo ("Santo") was, at all relevant times, Avantair's Chief Executive Officer.  Santo founded the Company, and was at all relevant times a director of Avantair.  Santo signed the Company's false and misleading SPEA and false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.  Santo is a licensed commercially trained pilot who has himself flown more than 1,000 hours in the Piaggio P-180 Avanti.

32.     Defendant Barry Gordon ("Gordon") was, at all relevant times, Chairman of Avantair's Board of Directors.  Defendant Gordon signed the Company's false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.

33.     Defendant A. Clinton Allen ("Allen") was, at all relevant times, a director of Avantair.  Defendant Allen signed the Company's false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.

34.     Defendant Stephanie Cuskley ("Cuskley") was, at all relevant times, a director of Avantair.  Defendant Cuskley signed the Company's false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.

35.     Defendant Richard B. DeWolfe ("DeWolfe") was, at all relevant times, a director of Avantair.  Defendant DeWolfe signed the Company's false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.

36.     Defendant Arthur H. Goldberg ("Goldberg") was, at all relevant times, a director of Avantair. Defendant Goldberg signed the Company's false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.

37.     Defendant Robert Lepofsky ("Lepofsky") was, at all relevant times, a director of Avantair. Defendant Lepofsky signed the Company's false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.

38.     Defendant Richard A. Pytak, Jr. ("Pytak") was, at all relevant times, Avantair's Chief Financial Officer. Defendant Pytak signed the Company's false and misleading annual report filed on Form 10-K with the SEC on September 28, 2009.

39.     Defendants Santo, Gordon, Allen, Cuskley, DeWolfe, Goldberg, Lepofsky, and Pytak, because of their positions with Avantair, possessed the power and authority to control the contents of the SPEA and the contents of Avantair's reports to the SEC. Each of the Defendants was provided with copies of Avantair's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the Special Situations Funds, and that the representations which were being made were then materially false and misleading.

## IV.    CONTROL ALLEGATIONS/GROUP PLEADING

40.     The Defendants controlled the content of the SPEA and Avantair's 2009 Form 10-K. The SPEA was publicly filed with the Securities and Exchange Commission on Form 8-K on October 22, 2009. It is appropriate to treat the Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the SPEA and the

Company's public filings are the collective actions of the narrowly defined group of Defendants identified above.

41.     The Defendants were directly involved in, or responsible for, ensuring that the Company comply with applicable FAA aircraft safety regulations, as well as the materially false and misleading public statements and released information related to the FAA's investigation into Avantair's deficient aircraft maintenance as alleged herein. At all times during the relevant period, the Defendants were aware, or with severe recklessness disregarded, that the materially false and misleading statements were being issued regarding Avantair, and the Defendants approved or ratified these statements, in violation of the federal securities laws.

42.     The Defendants participated in the drafting, preparation, and/or approval of the SPEA and the Company's 2009 Form 10-K and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of or recklessly disregarded their materially false and misleading nature. Because of their executive, directorship and/or managerial positions with Avantair, each of the Defendants had access to the undisclosed information about the FAA's investigation into Avantair's deficient aircraft maintenance as particularized herein, and knew, or with severe recklessness disregarded, that adverse facts rendered materially false and misleading the representations made in the SPEA by or about Avantair and its business.

43.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on the Special Situations Funds, as purchasers of unregistered Avantair securities, by disseminating materially false and misleading statements upon which Plaintiffs relied to purchase shares of Avantair common stock.

## V.   FACTUAL ALLEGATIONS

### A.   AVANTAIR

44.    Avantair was founded by Defendant Steven F. Santo in June 2003 and organized in 2004 as an "aircraft fractional ownership company" headquartered in Clearwater, Florida. Santo founded Avantair's predecessor company, Skyline Aviation Services, in 1998. At the time Santo founded Skyline Aviation Services, he was a commercially rated pilot.

45.    According to an October 2009 press release, at the time of Plaintiffs' investment and the execution of the SPEA Avantair had grown into "the only publicly traded stand-alone private aircraft operator" in the United States. At the time of Plaintiffs' investment, Avantair had approximately 400 employees and provided private aircraft services in the continental United States, Canada, the Caribbean and Mexico. Avantair stock was traded publicly on the OTC Bulletin Board, under the symbol AAIR.

46.    Despite being a publicly-traded company with numerous employees, Santo was responsible for all aspects of Avantair's daily operations. Avantair's Form 10-K for the fiscal year ending in 2009, filed with the SEC on September 28, 2009, states that "Mr. Santo has acquired specialized knowledge and skills with respect to Avantair and its operations and most decisions concerning the business of Avantair will be made or significantly influenced by him." By virtue of Avantair's business, these decisions invariably included those dealing with the maintenance and safety protocols for Avantair's aircraft.

### 1.   Fractional Aircraft Ownership

47.    Avantair's revenues were derived from the sale of "fractional" ownership in one specific type of light turboprop airplane, the Piaggio P-180 Avanti, as well as from the sale of "flight hour time cards" for those same aircraft.

48.     With a fractional aircraft ownership structure, customers purchase a share of a plane as opposed to the entire aircraft, and are then provided with guaranteed annual access to that aircraft or any aircraft in the fractional provider's fleet for an amount of days or hours relative to the size of the ownership share.  For instance, a one-eighth fractional owner might have access to any aircraft in Avantair's fleet for just shy of fifty days per year.  The most widely known fractional ownership provider is NetJets, Inc., which launched the fractional industry in the mid-1980s and was subsequently acquired by Berkshire Hathaway.

49.     Fractional owners are also responsible for their share of their aircraft's costs.  Thus, a one-eighth fractional owner would be responsible for one-eighth of the running costs and other ownership costs -- basically, one-eighth of everything having to do with maintaining the aircraft.

50.     A natural side-effect of the fractional ownership model is the high number of hours the planes must be flown.  Because each plane may serve scores of different customers, who each have an exclusive share of the aircraft, fractional aircraft are in constant flight.  According to a December 2013 article in *Business & Commercial Aviation*, Avantair's planes were being flown at a rate of 1200 aircraft hours per year, far higher than a normal private plane.

51.     Fractional ownership providers like Avantair have been and are subject to extensive FAA regulation.  The FAA provides review and approval of fractional programs under Part 91, Subpart K of the Federal Aviation Regulations ("FAR").

52.     In connection with the purchase of an ownership share, fractional service providers like Avantair agree to provide all of the necessary aviation support services to get their owner's planes to and from their destinations safely, including crewing the flights, training those crews, fueling the aircraft, record keeping, insurance, and maintenance.

53. Avantair required its customers to execute, among other documents, an Aircraft Interest Purchase Agreement, which generally dictated the relationship between Avantair and its fractional owners. Pursuant to that agreement, Avantair represented and warranted that on the day the ownership share was transferred,

> (i) the Aircraft shall have had a valid United States Standard Airworthiness Certificate, (ii) all manufacturer's mandatory inspection items shall be current, (iii) the Aircraft shall have been airworthy and fully operational and fully equipped and otherwise fit for operations under FAR Parts 91K and 135, and (iv) all Mandatory Services Bulletins and all FAA Airworthiness Directives with due dates prior to the Transfer Date shall have been complied with.

## 2. The Piaggio P-180 Avanti Aircraft

54. Where Avantair distinguished itself from other fractional carriers is through the type of aircraft in which it sold ownership shares. Avantair was the only fractional provider in North America to operate and sell shares in the P-180 Avanti (hence the name Avantair), manufactured in Italy by Piaggio Aero Industries S.p.A., a company headquartered in Genoa. According to a May 2014 article on Avantair's demise in *Business & Commercial Aviation*, Avantair purchased new Avanti aircraft from Piaggio for $6.8 million with the goal of selling the planes under the fractional program for an aggregate $7 million. Avantair was Piaggio's biggest single customer, and the only commercial provider of Avanti aircraft in North America.

55. The Avanti aircraft is a rear-engine plane powered by turboprop engines, not jet engines. As a practical matter, the Avanti aircraft's novel design and limited production meant that acquiring parts for the aircraft was more difficult than it would have been had Avantair utilized more readily available aircraft models, such as those manufactured by Cessna or Embraer.

56. Avantair's use of a single type of aircraft presented certain rewards and risks. Avantair could offer reduced-price services to its customers by standardizing maintenance,

inventory, and pilot training. If the FAA, however, issued any order or initiated any proceeding governing the Avanti aircraft, Avantair's entire fleet and business could be jeopardized.

57. At the time Plaintiffs made their investment in Avantair in October 2009, the Company managed a fleet of 55 aging Avanti airplanes. Avantair planned to replace and supplement its fleet by acquiring 53 more Avanti aircraft by 2013. By June 30, 2012, however, Avantair only operated 57 aircraft; its fleet was comprised of 45 fractionally-owned planes, six Company-owned planes, and six leased planes.

### B.   AVANTAIR'S HISTORY OF SYSTEMIC MAINTENANCE PROBLEMS

58. Pursuant to Freedom of Information Act requests, Plaintiffs were able to uncover Avantair's checkered maintenance history and numerous safety-related FAA fines (only after the fact of the Company's bankruptcy filing). Defendants' early problems with the FAA starting in 2006 are indicative of the institutional level of disregard for aircraft-safety standards that ultimately lead Avantair to ground its entire fleet, suspend its operations, and get forced by its creditors into bankruptcy, causing Plaintiffs' investment to fail.

### 1.   Pre-2009 FAA Fines

59. The first documented incident of which Plaintiffs have become aware, arising on March 3, 2006, concerned a defective warning indicator on an Avantair-operated Avanti aircraft. According to FAA records, this warning light, which illuminated to indicate that the engines were overheating, had remained lit up for at least eight separate flights but was never remedied. The FAA discovered that Avantair had instead tried to conceal the warning indicator with black tape. As a result, the FAA fined the Company $30,000.

60.     According to FAA documents obtained by *Aviation International News*, the FAA

had also levied another, substantially larger fine against Avantair in June 2008.  This fine, for

$500,000, stemmed from a series of maintenance-related violations of FAR regulations.

61.     This substantial penalty only came to light in October 2013 after a FOIA request

by *Aviation International News*.  Avantair failed to publicly disclose the half-million dollar fine at

the time, and has never disclosed the circumstances behind it.

## 2.     The 2009 FAA Investigation

62.     The FAA did not begin investigating Avantair's pervasive flouting of federal safety

standards in earnest until 2009.

63.     According to FAA documents obtained pursuant to Plaintiffs' FOIA requests, the

FAA issued a report in January 2009 finding that Avantair systematically flew its aircraft without

displaying the necessary identification placards on their tails.

64.     Thereafter, during the week of July 27, 2009 the FAA's Flight Standards District

Office ("FSDO") in Tampa, Florida conducted "Team Focused In-Depth inspections" of Avantair

aircraft.  The incidences of noncompliance uncovered in those inspections were documented by

the FAA in EIR 2009SO150256, the first of twenty-two separate Enforcement Investigative

Reports[2] that Avantair would eventually settle pursuant to a consent order with the FAA for a

$500,000 civil penalty in November 2012.

### i.     The September 15, 2009 FAA Cure Notice

65.     The FAA sent a September 15, 2009 cure notice to Avantair regarding its

investigation, referencing EIR 2009SO150256.   The cure notice was sent to Kevin Dillon

---

[2] An Enforcement Investigative Report, a so-called EIR, is the document issued by the FAA after
a compliance investigation has occurred and enforcement proceedings have commenced

("Dillon"), Avantair's Managing Director at its corporate headquarters in Clearwater, Florida. As Managing Director, Dillon oversaw Avantair's entire maintenance department, and was responsible for more than 100 of Avantair's 400 employees.

66. The September 15, 2009 letter identified twenty-six separate regulatory violations related to a single Avanti aircraft, bearing the registration number N102SL. According to the FAA's letter, "[t]hese regulatory findings may be considered a hazard to safety and operation of the aircraft prior to correction may be contrary to pertinent Federal Aviation Regulations."

67. Indeed, the September 15, 2009 letter reads like a laundry list of egregious and unsafe maintenance practices. Among the twenty-six safety issues highlighted,

(a) N102SL's number-one engine was changed, but Avantair did have any records indicating that the mounts connecting the engine to the aircraft were inspected;

(b) N102SL had on five separate occasions in the preceding twelve months flown for too many hours without having a mandatory inspection of its emergency locator transmitters;

(c) Avantair changed tires without documenting that the brakes were checked, in direct contravention of Piaggio maintenance manuals;

(d) an engine bearing the serial number PCE-RK0087 had, on five different occasions, been operated for more than 150 hours without having a mandatory 150 hour inspection conducted;

(e) an engine bearing the serial number PCE-RK0112 had gone without the mandatory 150 hour inspection on three separate occasions;

(f) three oil filter replacements were overflown, meaning that N102SL had operated for more hours than it was supposed to before receiving factory-scheduled oil replacements; and

(g) Avantair did not log maintenance entries indicating compliance with daily/preflight inspection requirements. In particular, the "daily inspection compliance" section was "not completed on any flight log."

68.     This last maintenance violation -- the failure to complete the daily inspection section of N102SL's flight log -- is particularly reflective of Avantair's institutionalized culture of noncompliance with basic federal aircraft safety standards.  According to the September 15, 2009 letter, Avantair repeatedly and deliberately cut corners regarding N102SL's maintenance on a daily basis, despite both Piaggio and the Avanti's engine manufacturer, Pratt & Whitney, requiring that preflight checks be conducted and documented every time an Avanti plane flew.

69.     Because Avantair flew only one type of aircraft, information indicating that one of those planes was critically noncompliant was substantially more important to Avantair than it would have been to another aviation company.  Accordingly, a problem identified with regards to one of the Avanti aircraft in Avantair's fleet often revealed similar problems across the entirety of Avantair's fleet, which more likely exposed Avantair to the risk that its entire fleet would be grounded.

70.     Avantair and the Defendants were thus incentivized to -- and in fact did -- keep the existence of the FAA's investigation from the public and Plaintiffs, because any indication that the Avanti aircraft were unsafe or were poorly maintained fleet-wide would pose grave, and possibly fatal, risks to the Company's viability.

### ii.     The Risks Facing Avantair's Business

71.     Indeed, Avantair's September 28, 2009 Annual Report, filed with the SEC on Form 10-K, highlighted a number of risks to the continuing viability of Avantair's business.  Under the heading "Government and Other Regulations," Avantair stated that

> Avantair, like all air carriers, is subject to extensive regulatory and legal compliance requirements, both domestically and internationally.  In addition to state and federal regulation, airports and municipalities enact rules and regulations that affect aircraft operations.  The FAA regulates Avantair's activities, primarily in the areas of flight operations, maintenance, and other safety and

technical matters. FAA requirements cover, among other things, security measures, collision avoidance systems, airborne windshear avoidance systems, noise abatement and other environmental concerns, and aircraft safety and maintenance procedures. *Specifically, the FAA may issue mandatory orders, relating to, among other things, the grounding of aircraft, inspection of aircraft, installation of new safety-related items and removal and replacement of aircraft parts that have failed or may fail in the future.*

72.     Under the heading "Risks Related to Our Business," Avantair further stated that

*Avantair's business is subject to extensive government regulation, which can result in increased costs, delays, limits on its operating flexibility and competitive disadvantages.*

Commercial aircraft operators are subject to extensive regulatory requirements. Many of these requirements result in significant costs. For example, *the Federal Aviation Administration (FAA) from time to time issues directives and other regulations relating to the maintenance and operation of aircraft, and compliance with those requirements drives significant expenditures.*

73.     Precisely because Plaintiffs were made aware by Avantair of these known risks, Plaintiffs relied heavily on the material representation in the SPEA that there was no pending FAA investigation or proceeding at the time of Plaintiffs' investment.

### iii.     The October 20, 2009 FAA Cure Notice

74.     The FAA supplemented its findings in an October 20, 2009 letter to Avantair, again sent from the Tampa, Florida FSDO to the attention of Kevin Dillon.

75.     This letter referenced the same EIR number -- 2009SO150256 -- that was the basis of the September 15, 2009 letter. It also referenced the July 27, 2009 Team Focused In-Depth inspections noted in the earlier letter.

76.     The October 20, 2009 letter highlighted additional "regulatory findings" that the FAA "considered a hazard to safety." Five pertained to N102SL, the Avanti plane that was the subject of the September 15, 2009 letter, including:

(a)     flight logs for N102SL were missing multiple pages;

(b)     one flight log page started out with a maintenance discrepancy denominated as "discrepancy 3" without listing what discrepancies one and two were;

(c)     N102SL had a transponder (the radio transmitter used to identify the plane to air traffic control) removed and replaced without a mandatory check being performed; and

(d)     a jump seat (the seat designated for use of the cabin crew) was installed on N102SL without completing the required serviceable parts tag.

77.    Three other violations pertained to a different Avanti aircraft bearing the registration number N156SL. These violations included (i) allowing a mechanic to approve a test flight, in contravention of applicable Federal Aviation Regulations, and (ii) the failure to perform and document checks of N156SL's omnidirectional range radio transmitter, the device which provides the pilot course guidance and automatic wind correction information, among other things.

78.    The final two violations listed in the October 20, 2009 letter referenced failures to comply with the Ground Operations Manual, the binding manual governing ground operations and servicing for Avantair's fleet. In particular, the FAA found that in every single flight log it reviewed, Avantair failed to adhere to the proper procedures for entering in-flight equipment discrepancies.

79.    Like the failure to complete the daily inspection section of N102SL's flight log, this flouting of basic, federally-regulated safety documentation demonstrates Avantair's institutionalized disregard for the maintenance procedures necessary to operate a viable commercial aviation business.

### C.   AVANTAIR, DELIBERATELY FAILED TO DISCLOSE TO ITS INVESTORS THE ONGOING FAA INVESTIGATION OR THE COMPANY'S SYSTEMIC MAINTENANCE PROBLEMS

80.     Avantair never disclosed to the public or Plaintiffs the September 15, 2009 cure notice, the October 20, 2009 cure notice, or the FAA investigation that precipitated them.  This is so despite the specific representation in the SPEA requiring them to do so.  (SPEA, ¶ 4.17).

81.     The reason for this is readily apparent.  Avantair and the Defendants could not risk its customers or possible investors discovering that the very bedrock of Avantair's business -- the reliability and sound maintenance of its entire fleet of aircraft -- was in violation of FAA regulations and subject to fines and possibly severe penalties by the FAA.

82.     Notwithstanding the pendency of the (undisclosed) FAA investigation and the very real risk that a serious fine or penalty could wreak havoc on Avantair's operations, in the fall of 2009 Avantair sought financing by way of a private placement of Avantair common stock.  As part of this private placement, Plaintiffs collectively purchased more than $6.4 million worth of Avantair securities.  According to a report filed with the SEC on Form 8-K on October 22, 2009, the funds from the private placement were to be used as working capital, for general corporate purposes, and to retire $6 million of debt.

#### 1.   The October 16, 2009 SPEA

83.     The terms of Plaintiffs' investment were governed by the SPEA, signed by Defendant Santo and executed by the parties on October 16, 2009, and closed on October 20, 2009. The SPEA contained a number of highly material representations and warranties.

84.     Certain of these representations and warranties were responsive to publicly disclosed risks facing the Company.  For instance, in each of its previous three Annual Reports filed with the SEC, Avantair disclosed that its material "Risk Factors" included extensive

government regulation and the possibility that the FAA could initiate proceedings that would threaten Avantair's airworthiness certificate and cripple Avantair's business.

85.    Given these known risks, the representations and warranties made in the SPEA were critically important to Plaintiffs in making their investment.

86.    The most important representations and warranties were as follows.

> "The Company and each Subsidiary possess adequate certificates, authorities or permits issued by appropriate governmental agencies or bodies necessary to conduct the business now operated by it, and neither the Company nor any Subsidiary has received any notice or proceedings related to the revocation or modification of any such certificate, authority or permit that . . . could reasonably be expected to have a Material Adverse Effect, individually or in the aggregate." (SPEA, ¶ 4.13).

> \* \* \*

> Since June 30, 2009, there has not been any "event or condition of any character that has had or could reasonably be expected to have a Material Adverse Effect." (SPEA, ¶ 4.8).  The SPEA defines Material Adverse Effect as "a material adverse effect on (i) the assets, liabilities, results of operations, condition (financial or otherwise), or business of the Company and its Subsidiaries taken as a whole, (ii) the validity of the Transaction Documents or (iii) the ability of the Company to perform its obligations under the Transaction Documents." (SPEA, ¶ 1).

> \* \* \*

> "[T]here are no pending actions, suits or proceedings against or affecting the Company . . . which could reasonably be expected to have a Material Adverse Effect,  individually or in the aggregate; and to the Company's Knowledge, no such actions, suits or proceedings are threatened or contemplated." (SPEA, ¶ 4.17).

87.    These representations and warranties were intended to dispel concerns that any of the risks stemming from the FAA's extensive regulation and oversight of Avantair had or were likely to materialize.  These representations and warranties, however, were false when made.

88.     The representations and warranties were materially misleading because they failed to disclose the ongoing FAA air safety investigation that would precipitate the Company's downfall, as noticed to Avantair by the FAA cure notices it had received in September and again in October 2009, prior to and contemporaneous with the closing of Plaintiffs' investment.  These cure notices put Avantair and the Defendants on notice that the FAA had initiated proceedings against the Company and that the Company was under investigation by the FAA for numerous and multiplying airworthiness violations.

89.     According to Avantair's own regulatory filings, Defendant Santo -- a commercially rated pilot -- was responsible for the day-to-day operations of the Company.  Santo was therefore responsible for maintaining Avantair's airworthiness with the FAA, and thus was aware of the pending FAA safety investigation.

90.     The FAA's October 20, 2009 cure notice, which amplified and expanded on the violations cited in the September 15, 2009 cure notice, further notified Avantair and the Individual Directors of the growing scope of the FAA's investigation into Avantair's maintenance issues.

91.     Avantair failed to disclose to Plaintiffs the existence of the October 20, 2009 letter, the FAA investigation referenced therein, or the airworthiness violations cited.

92.     The SPEA, which was initially signed by the parties on October 16, 2009, provided that the Company's representations and warranties set forth in the SPEA were to remain true and correct "at all times prior to and on the Closing Date." (SPEA, ¶ 6.1(a)).  The Plaintiffs investment closed on October 20, 2009.  Upon information and belief, before the Plaintiffs' purchase closed Avantair deliberately failed to inform Plaintiffs of the existence of the October 20 cure notice or the very fact that the FAA was already investigating Avantair's aircraft and safety practices pursuant to the September 15 cure notice, which preceded the SPEA's signing by over a month.

At the very least, Defendants were aware of the October 20, 2009 cure notice contemporaneous to the closing.

93.    The very existence of the September 15, 2009 and October 20, 2009 cure notices, and the FAA violations described therein, rendered the SPEA's representations and warranties false and misleading, which representations and warranties were crucial and material to Plaintiffs given the known risks facing a highly regulated aviation company like Avantair.

94.    Santo was motivated to hide the existence of the FAA investigation and safety proceedings from Plaintiffs. Avantair, the company he founded and had run since its inception, needed the infusion of Plaintiffs' capital to keep the Company running and pay off its substantial debt. If Santo had revealed in the SPEA the existence of the FAA proceedings Plaintiffs would never have sunk $6.4 million into a company facing the very real and known risk of a forced shut down.

### 2.    The Form 10-K

95.    The SPEA incorporated by reference the Company's Form 10-K for the fiscal year ending June 30, 2009. Specifically, the SPEA expressly represented that there had not been any material adverse change to the company since June 30, 2009, the effective date of Avantair's Form 10-K filing. The Form 10-K, however, was materially misleading because of the same omissions and material misrepresentations that made the SPEA fraudulent.

96.    The Form 10-K made a number of representations that were materially misleading at the time given the FAA's investigation and the September 15, 2009 letter.

97.    The Form 10-K was signed by each of the Defendants, and its accuracy was certified under the Sarbanes-Oxley Act of 2002 by Defendants Santo and Pytak.

98.     In the "Business" section at Item 1 of Part I, under the heading "Government and Other Regulations," Avantair stated that it, "like all air carriers," is "subject to extensive regulatory and legal compliance requirements," and that "[t]he FAA regulates Avantair's activities, primarily in the areas of flight operations, maintenance, and other safety and technical matter."

99.     In that same section, Avantair also stated that "the FAA may issue mandatory orders, relating to, among other things, the grounding of aircraft, inspection of aircraft, installation of new safety-related items and removal and replacement of aircraft parts that have failed or may fail in the future."

100.    By using the term "may," and failing to disclose any such order or FAA correspondence, Avantair represented in its 10-K that no such FAA action was pending or contemplated.

101.    This representation was false, and contradicted by the safety investigation referenced in the FAA's September 15, 2009 letter.

102.    The FAA's September 15, 2009 letter put Avantair and the Defendants on notice that the FAA had initiated proceedings against the Company and that the Company was under investigation by the FAA for its numerous and ever-growing airworthiness violations.

103.    After disclosing that the FAA heavily regulated the whole of Avantair's business, and that Avantair would be adversely affected by any FAA action in that regard, Avantair was under a duty to disclose the FAA investigation as revealed to it in the FAA's September 15, 2009 cure notice.

104.    The 10-K further described certain "Risk Factors," in Item 1A of Part I.  In that section, Avantair stated that the Company's "business is subject to extensive government regulation, which can result in increased costs, delays, limits on its operating flexibility and

competitive disadvantages." Avantair further stated that the FAA "from time to time issues directives and other regulations relating to the maintenance and operation of its aircraft."

105.    By disclosing that the FAA can and will issue such directives or regulations relating to flight operations, but not disclosing any actual FAA directives or regulations, Avantair effectively represented to investors in the 10-K that the FAA had not issued any directives or other regulations relating to the maintenance and operation of Avantair's aircraft, when in fact it had done so.

106.    Indeed, this representation was false, and contradicted by the investigation referenced in the FAA's September 15, 2009 letter.

107.    After disclosing that the FAA oversaw Avantair through extensive regulations, that these regulations could harm Avantair, and that such regulation could come in the form of maintenance directives and regulations, Avantair was under a duty to disclose the ongoing FAA safety inspection revealed in the September 15, 2009 letter. Avantair failed to do so.

108.    Plaintiffs made their $6.4 million purchase of unregistered Avantair securities in reliance upon the representations made in the SPEA and the Company's Form 10-K, and without any knowledge of Avantair's deliberate omissions concerning the adverse FAA proceeding or investigation.

109.    No reasonable investor such as Plaintiffs would have so acted if the truth about the FAA investigation and proceedings had been disclosed prior to the investment.

### D. THE RISKS FACING AVANTAIR AS A RESULT OF ITS SYSTEMIC MAINTENANCE PROBLEMS ULTIMATELY MATERIALIZED, AS THE FAA PERMANENTLY GROUNDED THE COMPANY'S FLEET, WHICH FORCED AVANTAIR INTO BANKRUPTCY

#### 1. The FAA Issued Twenty-Two EIRs Regarding Avantair's Maintenance Violations and Avantair Temporarily Grounded its Fleet

110.    Subsequent to Plaintiffs investment in the October 16, 2009 private placement, and with the truth about the FAA's investigation and the Company's pervasive fleet-wide maintenance problems still deliberately kept secret, Avantair continued to operate its aircraft in direct violation of federal safety regulations.

111.    EIR 2009SO150256, the FAA investigation report referenced in the FAA's September and October 2009 letters, was the first of twenty-two separate EIRs made by the FAA about Avantair between July 2009 and November 2012.

112.    According to the FAA, the "violations alleged and documented" in the EIRs were numerous, in addition to those set forth in the September 15, 2009 and October 20, 2009 letters. The violations also posed significant dangers to basic air safety, and existed in Avantair's entire fleet of aircraft. The violations cited by the FAA in the twenty-one subsequent EIRs included the following:

    (a)    "Denial of access to an FAA inspector who properly requested access to Avantair's principle place of business";

    (b)    "Failure to perform daily inspections, required by Piaggio, followed by aircraft operation without the required inspections";

    (c)    "Failure to accomplish a manufacturer-required brake check, followed by aircraft operation without the required check";

    (d)    "Failure to overhaul an engine after a critical temperature exceedance, followed by aircraft operation without the manufacturer required overhaul";

| | |
|---|---|
| (e) | "Installation of 20 aircraft parts on an aircraft without proper approval for return to service, followed by aircraft operation with parts improperly returned to service"; |
| (f) | "Installation of 20 aircraft parts on another aircraft without proper approval for return to service, followed by aircraft operation with parts improperly returned to service"; |
| (g) | "Installation of 13 aircraft parts on another aircraft without proper approval for return to service, followed by aircraft operation with parts improperly returned to service"; |
| (h) | "Failure to perform post-lightning strike safety and inspection procedures required by the manufacturer, followed by aircraft operation without completion of the procedures"; |
| (i) | "Failure to perform a transponder inspection required to resolve a discrepancy, followed by aircraft operation without completion of the required inspection"; |
| (j) | "Failure to perform post-lightning strike safety and inspection procedures on another aircraft, required by the manufacturer, followed by aircraft operation without completion of the procedures"; and |
| (k) | "Failure to document maintenance performed, followed by aircraft operation in revenue service." |

113.    As the above-listed FAA violations demonstrate, from 2009 and onward, Avantair -- while under investigation by the FAA -- was routinely sending planes into the sky that were poorly or improperly inspected and after Avantair cannibalized un-airworthy parts from another of its (overflown) aircraft.

114.    Apparently Avantair's culture of disregard for safety and maintenance was known (and carefully kept secret) within the company.  Thus, it now comes as no surprise that when *Business and Commercial Aviation* investigated one of Avantair's longtime fractional owners, the owner thanked God that "no one was killed on these badly maintained planes."

115.    Likewise, it also comes as no surprise that on October 20, 2012, Avantair grounded its entire fleet after it came to light that a key piece of equipment fell off of an Avanti aircraft before the plane made not one but two more trips, the second of which involving a flight carrying customers.

116.    As recounted by *Business Observer*,

> One of the firm's signature Piaggio twin turboprops took off from Camarillo., Calif., to pick up two passengers in San Diego, and fly them to Henderson, Nev.  The plane landed safely in Nevada, but the crew was startled to find that the tail's left elevator was missing — a part that helps a plane climb or descend.  Workers at the Camarillo airport spotted the elevator near a runway, the [National Transportation and Safety Board] revealed in its preliminary report, and although no passengers or crew were harmed, the plane was substantially damaged.

117.    A subsequent National Transportation and Safety Board ("NTSB") investigation revealed that Avantair was reusing a bolt to hold the elevator on all of its aircraft, and such reuse could cause the elevator to lose locking capability and fall off any of those planes.

118.    According to *Business & Commercial Aviation*, the fact that no one discovered the missing elevator until after the second leg of the trip meant that "the pilots had failed to perform a mandatory walk-around" after the first leg.  Those pilots were subsequently fired.

119.    Because Avantair only flew one unique type of aircraft, the same problems endemic to one plane were almost certainly occurring in every other plane in the Company's fleet, and Avantair could not operate any of its aircraft without the risk that its other planes did not have the same problem.

120.    Avantair and the Defendants were thus motivated to keep such gross Avanti aircraft maintenance problems a secret from the public and Plaintiffs.

121.    Avantair could not, however, keep its maintenance issues a secret from its pilots, who after being furloughed when Avantair grounded its fleet first publicly voiced their displeasure with Avantair's long history of flying un-airworthy planes.

122.    On the website AirlinePilotCentral, a forum for professional pilots to communicate, job hunt and share stories about airlines, Avantair's pilots discussed the conditions in which they were made to fly.  According to one posting,

> They've always had bad maintenance. Most of the pilots there don't know it. I've spent enough time in the shop and dealing with the maintenance side of the house to have seen it, though. I've personally seen falsification of maintenance paperwork on numerous occasions at Avantair, as well as pressure to fly unairworthy aircraft. Improper repairs. A gear door that was falling off. Two occasions of lightening [sic] strikes and electrical discharges in which the crew was ordered to fly the aircraft (and refused) . . . on one of those occasions the Chief Pilot came out and flew it instead. The engines had to be removed and torn down, the propellers needed overhaul, the airframe needed degaussed [sic], and holes were burned through the airframe all over.
>
> I once picked up one of their airplanes from maintenance, flew it on a short leg, and landed with sixteen major squawks [in-flight problems]. The company accused me of performing "shirt-pocket maintenance." I asked what that meant, and I was told I'd obviously been flying the airplane for a week, and hiding all the squawks. When I pointed out that I picked up the airplane at one maintenance base (after completing an inspection and being released as airworthy) and flew it on one leg to another maintenance base, where I grounded the airplane. They tried to make the paperwork disappear . . . .
>
> I was fired for trying to bring a union on the property . . . and I didn't know anything about the union . . . didn't find out about it until later, when Santo himself offered me my job back . . . and instructed me to make sure everyone knew it had nothing to do with the union. First time I'd heard about a union. They fired four people, me one of them, over that...and got the wrong people. They were so hot to trot over it that they fabricated a list of seventeen false charges (my favorite was that I'd "bent a flap in half over a GPU"--didn't happen, like all the charges). Complete fabrications. it's [sic] the way they operate, though.

123.     According to another pilot, who worked at a different fractional provider but who was intimately familiar with Avantair's practices,

> How you guys haven't killed anybody yet is amazing. I have personally overheard your pilots on the phone being threatened with termination for not wanting to fly an aircraft with a total screen failure after coming back to an emergency landing . . .
>
> You guys have no business flying aircraft in these horrible UNSAFE conditions. You endanger the entire industry.

124.     According to Santo, however, the only thing wrong with Avantair's flight operations in November 2012 were the isolated elevator problem and, according to an e-mail obtained by *Business & Commercial Aviation*, "'an evolution in the FAA's policies' regulating the fractional industry." But FAR Part 91, Subpart K, the FAA regulations governing fractional carriers, had not been amended before Avantair grounded its aircraft.

### 2.     Avantair Settles the FAA Charges for $500,000 but Its Culture of Disregard for Safety Regulations Persists

125.     The tail elevator problem that was the ostensive reason made publicly known for the October 20, 2012 grounding was not the only safety issue that Avantiar had to satisfactorily resolve with the FAA before Avantair planes could return to service.

126.     According to Avantair's November 6, 2012 Order of Agreed Settlement with the FAA ("November 2012 Order"), obtained by Plaintiffs pursuant to a FOIA request, Avantair was required to "develop corrective action plans to address" all of "the unresolved discrepancies" documented in the FAA's EIRs.

127.     Santo admitted as much at the time, telling *Aviation International News* in the week after the grounding that the extensive review of its safety protocol "is necessary as we introduce higher levels of standards and accountability across all of our operations."

128.    Avantair was also assessed a $500,000 civil penalty in the November 2012 Order for the violations described in the FAA's EIRs. It is unclear whether this fine was ever in fact paid. The first $50,000 was to be remitted to the FAA no later than three months after twenty-five Avantair aircraft resumed operation.

129.    Avantair never restored to airworthiness even a bare majority of its fleet. Even after the November 2012 temporary grounding and FAA settlement, Avantair failed to return to service more just than a limited number of fully operational Avanti aircraft.

130.    According to the November 2012 Order, Avantair was required to validate with the FAA that each aircraft being returned to active service conformed to FAA standards. But by this point, according to a May 2014 *Business & Commercial Aviation* article on the Company's downfall, Avantair was "like a cancerous organism," and was too handicapped by its history of cutting corners and disregarding safety protocols to resuscitate its fleet.

131.    Avantair refused to mend its ways and instead pressed forward in its culture of disregard for maintenance standards and deliberate lack of internal controls. *Business & Commercial Aviation* describes a Company that in the winter and early spring of 2013 was telling the world one thing while disintegrating behind the scenes:

> Despite [Santo's] attempts to mollify the feds and reassure the fractional owners who had made his program possible, a culture not of safety and accountability but of incompetence, executive entitlement and subterfuge was playing itself out in the background. Ultimately, a climate of chaos and desperation gripped the company
> . . .

132.    Santo in particular embodied the culture of "executive entitlement." According to *Business & Commercial Aviation*, at a time when Avantair only had "seven to 13 aircraft flying," Santo "was co-opting airplanes for personal travel from Clearwater to Telluride, Colo., where he had a home." When this occurred, the Company would have to cancel a fractional owner's flight.

-33-

133.    Moreover, according to *Business & Commercial Aviation* "it appears the [C]ompany was grossly noncompliant with [FAA regulations]," and that the Company was actively trying to "pull the wool over the FAA's eyes," as had always been its practice:

> The [C]ompany . . . proposed moving the maintenance records, the entire maintenance control staff, the chief pilot, the vice president of operations and the operations director -- everyone vital to the [operating] certificate [maintained with the FAA] -- to Orlando International Airport to get them under the purview of another [FAA district office], one that wasn't that familiar with the [C]ompany, as the [FAA district office] in St. Petersburg was talking about not allowing us to resume operations.

134.    Avantair also unabashedly cannibalized parts, as it historically had done, in order to keep as many Avantis in the air as possible while at the same time, according to *Business & Commercial Aviation*, "no one was keeping track of which parts were going onto what aircraft."

135.    These problems were the same as those highlighted in the FAA investigation and as documented in its September and October 2009 cure notices to Avantair, which at this point in time were even more serious given the limited number of Avantair aircraft in operation and the Company's desperate straits.

136.    In the fall of 2009, planes were skipping required maintenance checks and entire logbooks were not being filled out properly.  By the spring of 2013, "there were times when an airplane would come in, and as a normal procedure the mechanics would do a pre-run of the engines and systems for diagnostic purposes, and management would *order us to start removing parts from the airplane while the engines were still running*."

137.    According to *Business & Commercial Aviation*, it was simply impossible for the cannibalization problem to have emerged out of nowhere -- this was "[n]ot something that creeps up on you." In other words, this practice was a direct outgrowth of Defendants' historical institutional indifference to safety and maintenance.

-34-

### 3. The CW Confirms That Avantair Continued to Flout FAA Regulations Before its Demise

138.    The CW interviewed by Plaintiffs' counsel served as Avantair's Director of Quality Assurance from May 2013 until mid-July 2013.  Avantair hired the CW, a thirty-year aviation industry veteran, specifically so that the CW could address the "huge problem" with maintenance described in the allegations above.  This "problem" included Avantair's "very poor maintenance and operations practices which included cannibalizing parts" and the "resulting safety issues such as aircraft" flying with parts that had not been inspected.

139.    According to the CW, these precise issues -- the cannibalizing of parts and failure to properly ensure that parts were airworthy -- had been the subject of previous FAA proceedings "which were consented to by Avantair and resulted in sanctions to Avantair."

140.    Upon information and belief, the reports about these earlier proceedings included the proceedings referenced in the September 15, 2009 and October 20, 2009 cure notices, which were eventually settled with the FAA in the November 2012 Order.

141.    The CW observed at least three issues with Avantair that were indicative of the Company's institutionalized culture of disregard for federal safety and maintenance regulations.

142.    First, the CW observed that "senior management" placed responsibilities on "inexperienced or inadequately trained personnel" and displayed a culture of "rotating personnel to suit their demands."  In one instance, the CW personally observed work not being completed on time-sensitive parts because the records supervisor in charge of the parts had a background in human resources and was thus unqualified to monitor and maintain airworthiness records.

143.    Second, the CW observed that Avantair's maintenance compliance platform, AVTRAK, was a "veritable disaster."  According to the CW, there were as many as fifty

individuals who could make changes to the program, when a manageable and safe number of such individuals should have been six.

144.    The CW observed "senior management" change the service intervals due for parts. Because of this, the CW believed that senior management used AVTRAK to deliberately "fly aircraft beyond the maintenance schedule as they saw fit." When the CW deliberately locked Executive Vice President Kevin McKamey ("McKamey") out of AVTRAK, McKamey was "irate." According to the CW, "the situation created was criminal," and it created "knowing unsafe flights."

145.    Third, Avantair egregiously cannibalized parts and kept poor records. The CW believed that it was the combination of these two factors that "led to [the Company's] demise." For instance, the CW personally observed that a cannibalized starter generator -- the devise that rotates the engine fast enough to ignite the plane's fuel -- which was tracked to a specific aircraft, was not actually on that plane.

146.    When the CW followed up with supervisors about why they cannibalized parts without regard to air safety concerns, the CW was told that "senior management put pressure upon [the supervisors] with the threat of job loss."

147.    The CW was personally aware that Avantair's culture of disregard for proper maintenance, "in which procedures were contrary to the [Federal Safety Regulations] and everything that [the CW] was taught," existed long before the CW arrived.

**4.    Avantair Is Involuntarily Forced into Bankruptcy by its Creditors**

148.    In June 2013, Santo finally revealed that the Company's practice of secretly moving parts from plane to plane without properly tracking those parts meant that the Company had no idea which of its merely five remaining operational planes were actually airworthy.

149. Upon Santo's June 2013 admission that the Company had been cannibalizing parts and had lost track of its airworthiness records, Avantair ceased all flight operations.

150. The FAA thereafter pulled Avantair's flight certificate. The FAA's July and August 2013 investigation into the grounding revealed the "unairworthiness of a sizeable sample" of the Avantair fleet; as revealed by *Business & Commercial Aviation* in its May 2014 post-mortem, there were missing engines and propellers and dozens of other discrepancies in documentation, and other issues such as missing components and loose panels.

151. These were the same exact types of maintenance and safety issues deliberately hidden from Plaintiffs when Avantair and the Defendants failed to disclose to Plaintiffs the 2009 FAA safety investigation at the time Plaintiffs entered into the SPEA.

152. On June 26, 2013, the Company announced publicly that it was furloughing employees "as the Company addresses liquidity issues and seeks alternative financing arrangements." The next day, Defendant Cuskley resigned from the board of directors, citing "personal reasons."

153. On July 25, 2013, a group of Avantair fractional owners commenced an involuntary Chapter 7 petition against the Company in the Bankruptcy Court for the Middle District of Florida. The petition stated, among others, that owners were "unable to obtain information about their specific program aircraft," and of the aircraft which could be physically located, most were "not in working condition. . . . The aircraft appear to be cannibalized for parts, engines are missing, there are no maintenance records with the aircraft, the logbooks are not complete." Avantair never responded to the petition.

154. Several lawsuits brought by fractional owners and former employees outside of the bankruptcy proceeding were filed as well.

155.    A former fractional owner, Stearns Lending, Inc., filed a fraud action in the United States District Court for the Central District of California, Docket No. SACV13-1320, alleging that Defendant Santo, among others, fraudulently induced Stearns Lending to purchase flight time from Avantair all the while knowing the Company was facing insolvency.  Also, former Avantair employees filed a class action lawsuit against the Company in the United States District Court for the Middle District of Florida, Docket No. 13-cv-1783, alleging that the Company's furlough violated the Fair Labor Standards Act ("FLSA") and the Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act").  In addition, fractional owners, seeking possession of the Avanti aircraft in which they owned an interest, filed a class action lawsuit in Oklahoma state court, Heisman Square, L.L.C. v. Avantair, Inc., Case No. 2013-1867, in which they allege that Avantair failed to maintain its aircraft and failed to maintain a pool of "professionally trained and qualified pilots."

156.    Tellingly, Defendants' institutional disregard for safety and maintenance was so pervasive and impactful that notwithstanding the various legal proceedings, it is still not clear as of this filing whether any aircraft within Avantair's fleet, and any of the parts that Avantair cannibalized, are airworthy.  Indeed, a January 2014 FAA Order found that "the airworthiness of [former Avantair] parts is at best questionable because the Avantair tracking system and recordkeeping system for such parts are at best questionable, and more than likely deficient."  According to this same Order, "[s]afety in air commerce and air transportation would be adversely affected" if parts that were used on Avantair aircraft were returned to active service uninspected.

## VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS CAUSE PLAINTIFFS SUBSTANTIAL LOSS

157.    As set forth below, Defendants Santo, Gordon, Allen, Cuskley, DeWolfe, Goldberg, Lepofsky, and Pytak made materially false and misleading statements in which they

-38-

misrepresented, or failed to disclose material facts concerning, Avantair's history of disregard for FAA safety regulations and the FAA's 2009 safety investigation into the Company.

158.    Defendants' material misrepresentations and omissions were the direct result of Avantair's culture of institutional disregard for regulatory standards and safety concerns. The risks associated with this failure of internal control and management materialized in June 2013, forcing Avantair to ground its fleet, suspend its operations, and, eventually, suffer a petition in bankruptcy. As a direct and proximate result of Defendants' unlawful misrepresentations and omissions as alleged herein, Plaintiffs were damaged when their investment was wiped out.

## CAUSES OF ACTION

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder – Misstatements and Omissions
### (Against All Defendants)

159.    Plaintiffs repeat and reallege each and allegation contained in paragraphs 1 through 158 of this Complaint as if set forth herein. This claim is asserted against all Defendants.

160.    Defendants knew, or were severely reckless in failing to know, of the material omissions from, and misrepresentations contained in, the statements as set forth above.

161.    Defendants, with knowledge of or severely reckless disregard for the truth, disseminated or approved statements in the SPEA and September 28, 2009 Form 10-K, referred to above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162.    Defendants, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on the Special Situations

Funds and concealed material adverse information regarding the then existing business conditions and absence of any FAA proceedings against the Company as specified herein.

163.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Special Situations Funds in connection with their purchases of Avantair securities.

164.    In reliance on the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above (including the materially false and misleading information regarding the absence of any FAA proceedings regarding Avantair's failure to operate safe aircraft), Plaintiffs acquired Avantair common stock under the SPEA on October 16, 2009.

165.    Had Plaintiffs known of the materially adverse information not disclosed by Defendants and known that Defendants were concealing the existence of the FAA investigation, Plaintiffs would not have invested in Avantair by purchasing Avantair common stock.

166.    Defendants' failure to disclose this investigation was a direct result of its institutionalized culture of disregard for regulatory standards and safety concerns.  When the risks associated with this failure of internal control and management materialized, they forced Avantair to ground its fleet and drove the Company into bankruptcy, wiping out Plaintiffs' investment. Plaintiffs' damages were the direct and proximate result of Defendants' unlawful conduct as alleged herein.

167.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

168.    The SPEA was executed on October 16, 2009, and by virtue of its representations regarding the Company's most recent Form 10-K, incorporated by reference that financial report. Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPEA was executed.  Consequently, this action is timely.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against All Defendants)

169.    Plaintiffs repeat and reallege each and every contained in paragraphs 1 through 158 of this Complaint as if set forth herein.  This Claim is asserted against all Defendants.

170.    By reason of the wrongful conduct described herein, Avantair committed a primary violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

171.    Each of Defendants, by reason of his or her management position was a controlling person of the Company within the meaning of Section 20 of the Exchange Act.

172.    Each of the Defendants had the power, influence and authority to cause, and did cause, directly or indirectly, others to engage in the wrongful conduct complained of herein, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Defendants were provided with or had unlimited access to copies of the SPEA and the Company's reports and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

173.    The Defendants were culpable participants in Avantair's violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged above.

174.    By reason of such wrongful conduct, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

175.    As a direct and proximate result of their wrongful conduct, the Special Situations Funds suffered damages in connection with their purchases of the Company's securities in amounts to be proved at trial.

176.    The SPEA was executed on October 16, 2009, and by virtue of its representations regarding the Company's most recent Form 10-K, incorporated by reference that financial report. Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPEA was executed.  Consequently, this action is timely.

## COUNT III

### Violations of Blue Sky Law
### (Against All Defendants)

177.    Plaintiffs repeat and reallege each and every contained in paragraphs 1 through 158 of this Complaint as if set forth herein.  This Claim is asserted against all Defendants.

178.    This is an action for securities fraud under Fla. Stat. 517.211 for a violation of Fla. Stat. 517.301.

179.    Florida Statute 517.301(1)(a) makes it unlawful for a person to "employ . . . artifice to defraud," or use "any untrue statement of a material fact or any omission . . . [to mislead]" in connection with the sale of any investment or security.

180.    Defendants knew, or were severely reckless in failing to know, of the material omissions from, and misrepresentations contained in, the statements as set forth above.

181.   Defendants, with knowledge of or severely reckless disregard for the truth, disseminated or approved statements in the SPEA and September 28, 2009 Form 10-K, referred to above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.   Defendants, individually and via a fraudulent scheme, directly and indirectly, participated in a course of business that operated as a fraud or deceit on the Special Situations Funds and concealed material adverse information regarding the then existing business conditions and absence of any FAA proceedings against the Company as specified herein.

183.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly and indirectly, have violated Florida Statute 517.301 in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the Special Situations Funds in connection with their purchases of Avantair common stock.

184.   In reliance on the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above (including the materially false and misleading information regarding the absence of any FAA proceedings regarding Avantair's failure to operate safe aircraft), Plaintiffs acquired Avantair common stock under the SPEA.

185.   Had Plaintiffs known of the materially adverse information not disclosed by Defendants and known that Avantair was concealing the existence of the FAA investigation, Plaintiffs would not have invested in Avantair by purchasing Avantair common stock.

-43-

186.    Defendants' failure to disclose this investigation was a direct result of its institutionalized culture of disregard for regulatory standards and safety concerns.  When the risks associated with this failure of internal control and management materialized, they forced Avantair to ground its fleet and drove the Company into bankruptcy, wiping out Plaintiffs' investment. Plaintiffs' damages were the direct and proximate result of Defendants' unlawful conduct as alleged herein.

187.    By virtue of the foregoing, Defendants violated Florida Statute 517.301.

188.    The SPEA was executed on October 16, 2009, and by virtue of its representations regarding the Company's most recent Form 10-K, incorporated by reference that financial report. Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the date the SPEA was executed.  Consequently, this action is timely.

### **PRAYER FOR RELIEF**

WHEREFORE, the Special Situations Funds respectfully request relief and judgment, as follows:

(a)     Awarding compensatory and/or rescissory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding the Special Situations Funds their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees, pursuant to Fla. Stat. 517.211(6); and

(c)     Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: October 16, 2014

J. Ron Denman
Florida Bar No. 0863475
Robert W. Bleakley
Florida Bar No. 0966436
**THE BLEAKLEY BAVOL LAW FIRM**
15170 N. Florida Avenue
Tampa, Florida 33613
813.221.3759 – Phone
813.221-3798 – Facsimile

and

Steven M. Hecht (*pro hac vice* admission pending)
**LOWENSTEIN SANDLER LLP**
1251 Avenue of the Americas
New York, New York 10020
212.262.6700
shecht@lowenstein.com

*Counsel for Special Situations Fund III QP, L.P., Special Situations Cayman Fund, L.P., Special Situations Private Equity Fund, L.P., and David M. Greenhouse*